IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 05-cv-00466-PSF-MEH

ECHOSTAR SATELLITE LLC, a Colorado limited liability corporation,
f/k/a ECHOSTAR SATELLITE CORPORATION,

    Plaintiff,

v.

PERSIAN BROADCASTING COMPANY, INC., a California Corporation,
f/k/a ATLANTIS ENTERPRISES, LLC, a/k/a PBC, a/k/a TAPESH TV; and
TAPESH NETWORK PERSION BROADCASTING COMPANY,
a California Corporation,

    Defendants.

## ORDER ON PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment on Its Claim for Breach of Contract and Against Defendants' Counterclaim (Dkt. # 46) and Plaintiff's "No Evidence" Motion for Summary Judgment Against Defendant's Counterclaim (Dkt. # 47), both filed on June 29, 2006. Defendants filed their response on August 11, 2006 (Dkt. # 60), and plaintiff replied on August 28, 2006 (Dkt. # 66). Defendants' attorney subsequently filed a motion to withdraw as defense counsel on April 2, 2007 (Dkt. # 86), which the Court granted, and defendants' new attorney entered an appearance on June 8, 2007 (Dkt. # 94). Plaintiffs' motions for summary judgment are ripe for disposition.

**I.      BACKGROUND**

Plaintiff EchoStar Satellite LLC ("EchoStar") provides Direct Broadcast Satellite service throughout the United States under its trade name, DISH Network. Final Pretrial Order (Dkt. # 76) at 9. Defendants Persian Broadcasting Company, Inc. and Tapesh Network Persian Broadcasting Company (collectively "PBC") own and distribute two Farsi language audio and video programming channels called Tapesh 1 and Tapesh 2 (the "Programming"). *Id.*

On September 10, 2003, EchoStar and PBC entered into an Affiliation Agreement whereby PBC would deliver its Programming to EchoStar for broadcasting on the DISH Network and EchoStar would have the exclusive license and right to broadcast the Programming in the United States. *Id.* at 10; Agreement (Ex. 1 to Pl.'s Mot.), § 2.1. The Agreement gave PBC until February 28, 2004, to migrate its Programming over to the DISH Network from its then-current broadcast service on GlobeCast North America Incorporated's ("GlobeCast") Telstar 5 satellite. *Id.*, § 2.1.1. The deadline for PBC to cease broadcasting on GlobeCast was later extended to September 30, 2004. Quattromani Aff., ¶ 3, attached to Pl.'s Mot. The Agreement had an initial four-year term commencing on the date of EchoStar's launch of the Programming, with a right of renewal by EchoStar for an additional two-year period. Agreement, Ex. A, ¶ 6.

EchoStar alleges that PBC materially breached the Agreement, in part by continuing to distribute its Programming on GlobeCast after the deadline for migration of the Programming had passed. Sec. Am. Compl. (Dkt. # 42), ¶ 18. In this lawsuit,

EchoStar seeks damages against PBC for breach of contract and requests a permanent injunction compelling PBC to abide by the terms of the Agreement. PBC has asserted a counterclaim for breach of contract. EchoStar now moves for summary judgment on its own breach of contract claim and against PBC's counterclaim.

## II.   STANDARD OF REVIEW

Summary judgment for the moving party is appropriate when there is no genuine issue as to any material fact in the pleadings, depositions, answers to interrogatories, admissions, and affidavits. F.R.Civ.P. 56(c). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). When applying this standard, the court must view the factual record in the light most favorable to the nonmovant. *Applied Genetics Int'l v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). However, when the moving party meets its burden, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." F.R.Civ.P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324.

## III.   ANALYSIS

Jurisdiction in this case is based on diversity, and Colorado law applies to plaintiff's substantive claims for relief. To prevail on a breach of contract claim, PBC must prove four elements: (1) the existence of a contract; (2) performance by the plaintiff, or some justification for nonperformance; (3) failure to perform the contract by

defendants; and (4) damages to plaintiff. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (internal citations omitted). In this case, EchoStar claims that PBC committed four independent breaches of the Agreement. The Court will analyze each element of EchoStar's breach of contract claim in turn.

### A.     Existence of a Contract

The first element of Echostar's claim is not in dispute; neither party denies that the Agreement is a valid, binding contract.

### B.     Plaintiff's Performance or Justification for Nonperformance

EchoStar must next demonstrate that it performed under the Agreement or was justified in not performing. EchoStar asserts that it owes a duty under the Agreement to broadcast the PBC Programming, Pl.'s Mot. at 14,[1] and presented evidence that the Programming was launched in 2004 and is available to DISH Network subscribers. Quattromani Aff., ¶ 4; Jamili Dep., Vol. I at 35, 37 (both attached to Pl.'s Mot.). Additionally, the Agreement requires EchoStar to spend in excess of $100,000 per calendar year on marketing the Farsi programming. Agreement, § 7.3. EchoStar presented undisputed evidence that it satisfied this marketing requirement. *See* Moore Aff., ¶ 4; Alirghassemi Dep. at 36, 38, 40–41 (both attached to Pl.'s Mot.). Moreover, PBC does not appear to dispute that EchoStar performed under these or any other

---

[1] It is not entirely clear that the Agreement obligates EchoStar to broadcast based on the language of section 2.1, which provides that PBC "grants to EchoStar, the exclusive license and right (*but not the obligation*)" to distribute the Programming. Agreement, § 2.1 (emphasis added). As EchoStar recognizes that it has such a duty, however, the Court will consider whether it satisfied that duty.

4

provisions of the Agreement. Thus, the evidence shows that EchoStar performed its obligations under the Agreement as a matter of law.

### C.     Failure to Perform by Defendants

To satisfy the third element of its claim, Echostar must show that PBC failed to perform its obligations under the Agreement. EchoStar has alleged that PBC breached four provisions of the Agreement, which are analyzed separately below.

#### *1. The Exclusivity Provision*

The Agreement gives EchoStar the "exclusive right and license" to broadcast PBC's Programming. Agreement § 2.1. Echostar contends that PBC continued to broadcast the Programming on a non-EchoStar satellite service—Globecast's Telstar 5 satellite—beyond the time period agreed to by the parties for the Programming migration to DISH Network to occur, thus breaching the exclusivity provision. The pertinent provision of the Agreement provides:

> Notwithstanding the foregoing grant of exclusive rights, [PBC] shall not be in breach of the exclusivity provision contained in this Agreement, if [PBC] distributes the Tapesh 1 channel to subscribers to its current service offered on the Telstar 5 satellite ("Current Service") (provided that such subscribers shall be limited to those subscribers that are in existence as of the Effective Date) . . . until February 28, 2004 and during such time, [PBC] shall use its best efforts to migrate the [PBC] Customers to the DISH Network distribution platform . . . . *For clarity, the parties agree and acknowledge that notwithstanding anything to the contrary contained in this Agreement, in no event will [PBC] broadcast the Tapesh 1 channel on the Current Service after February 28, 2004.*

Agreement, § 2.1.1 (emphasis added). As noted above, the Agreement's February 28, 2004 deadline for PBC to cease broadcasting on the Telstar 5 satellite was later extended until September 30, 2004. Quattromani Aff., ¶ 3.

PBC does not deny that it continued to broadcast Tapesh 1 beyond the agreed-upon deadline; in fact, PBC's President Masoud Jamili and CFO Alireza Alirghassemi testified that PBC never removed its Programming from GlobeCast.  Jamili Dep., Vol. I at 99; Alirghassemi Dep. at 51.  Rather, PBC asserts that the exclusivity provision is "ambiguous, at best, as to whether the broadcasting prohibition extends only to distribution to 'subscribers' or to all distribution on GlobeCast beyond the September 30, 2004 deadline."  Def.s' Opp. at 6.  PBC argues that GlobeCast has no "subscribers" who pay a monthly fee and, therefore, the Agreement allowed PBC to continue to broadcast on GlobeCast because there were no such "subscribers."

The Court rejects PBC's attempt to create ambiguity where none exists.  Under applicable Colorado law, whether a contract is ambiguous is a question of law.  *E. Ridge of Fort Collins v. Larimer & Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005).  A contract must be interpreted as a whole to ascertain and effectuate the intent of the parties as determined primarily from the language of the contract.  *Id.* (citing *May v. United States*, 756 P.2d 362, 369 (Colo. 1998)).  A provision is ambiguous if it is "fairly susceptible to more than one reasonable interpretation."  *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996) (citation omitted).  Mere disagreement among the parties does not itself establish ambiguity.  *Id.*

Applying these principles, the Court holds that § 2.1.1 is unambiguous and required PBC to cease broadcasting with GlobeCast by the contractual deadline.  It is true that the provision allowed PBC to continue broadcasting to GlobeCast's then-current "subscribers" until the agreed-upon deadline, and EchoStar does not contest

that GlobeCast does not have paying subscribers.  However, the provision also states unequivocally:  "For clarity, the parties agree and acknowledge that notwithstanding anything to the contrary contained in this Agreement, in no event will [PBC] broadcast the Tapesh 1 channel on the Current Service [GlobeCast] after [the deadline]."  This language requires PBC to cease broadcasting its Tapesh 1 channel on GlobeCast after the stated deadline, regardless of the extent of its authority to broadcast prior to that date.  Moreover, the omission of the Tapesh 2 channel from the provision is immaterial, as Tapesh 2 was not in existence when the parties entered into the contract and thus was not being broadcast on GlobeCast at that time.  Jamili Dep., Vol. I at 61, 100.

Furthermore, PBC's interpretation of section 2.1.1 defeats its purpose—to grant EchoStar an *exclusive* right to broadcast PBC's Farsi programming.  If PBC were free under the Agreement to continue broadcasting on the GlobeCast satellite because GlobeCast has no paying subscribers, EchoStar by definition could not "exclusively" broadcast or distribute PBC's Programming.  Thus, PBC has not shown that there is more than one reasonable interpretation of the provision.

Because there is no ambiguity in the exclusivity provision of the Agreement and the undisputed evidence shows that PBC failed to comply with this provision, the Court finds as a matter of law that PBC breached the exclusivity provision by continuing to broadcast the Programming on GlobeCast beyond the agreed-upon deadline. Moreover, even if the provision were ambiguous, the extrinsic evidence demonstrates as a matter of law that PBC's interpretation is at odds with the parties' intent. Mr. Jamili, the CEO of PBC, testified that his understanding of the Agreement as

7

amended was that it "gave Tapesh until September 30, 2004 to migrate off of T5." Jamili Dep., Vol. II at 70.  PBC points to no contrary evidence in its response. Accordingly, the Court holds as a matter of law that PBC was required under the Agreement as modified to cease broadcasting its Tapesh 1 channel on GlobeCast by September 30, 2004, and that PBC did not comply with that requirement.

### *2.  Representations and Warranties*

The parties represented and warranted in the Agreement that they were "under no contractual or other legal obligation that shall in any way interfere with [their] full, prompt and complete performance hereunder."  Agreement, § 8.1.  PBC further represented and warranted in the Agreement that "it presently has and will continue to have at all times during the Term all rights necessary to grant EchoStar the rights contracted for by EchoStar under this Agreement, including without limitation the exclusive right to distribute and broadcast in the [United States] all programming content included within the Programming Service."  *Id.,* § 8.2.1.

EchoStar contends PBC breached these representations by extending its contract with GlobeCast until September 2007 after entering into the Agreement with EchoStar.  Unlike EchoStar's first claim of breach, discussed above, here EchoStar claims that the mere existence of PBC's contract with GlobeCast amounted to a breach of the Agreement because the GlobeCast contract obligated PBC to broadcast Tapesh 1 with GlobeCast until well after PBC was obligated under the Agreement to cease such broadcasting.  Pl.'s Mot. at 17.  Because PBC's obligation to broadcast on GlobeCast interfered with PBC's ability to grant EchoStar exclusive broadcasting rights,

EchoStar contends, the result was a violation of PBC's representations in the Agreement.

The Court holds that PBC's contract with GlobeCast did not prevent PBC from complying with its obligations to EchoStar. Under its contract with GlobeCast, PBC simply leases transponder capacity and downlink and uplink services from GlobeCast, and makes a monthly lease payment to GlobeCast that appears unrelated to whether PBC actually broadcasts over the leased channels. *See* Def.s' Opp., Ex. 2 at 1 & § 4. There is no provision that obligates PBC to actually broadcast the Programming on GlobeCast, which has no apparent interest in whether that occurs as long as PBC complies with its monthly payment obligations. Thus, PBC's contract with GlobeCast in and of itself does not amount to a breach of PBC's representations and warranties under the Agreement with EchoStar.

### 3. Tapesh 2 Programming Content Requirement

The Agreement required PBC to provide original Farsi language programming on the Tapesh 2 network as follows: "Tapesh 2 . . . consists of original . . . [PBC] Farsi Language general entertainment programming" that "is to be comprised of approximately 25% live news, 25% movies . . . , 35% sports . . . , and 15% music programming." Agreement, Ex. A, ¶ 1.2. The Agreement also provided that "[a]t least eighty percent (80%) of the hours of programming . . . shall be original programming." Agreement, § 3.1. According to Jamili's testimony, however, Tapesh 2 is "all music," not all of the music videos shown have been in the Farsi language, and only 70% of the Programming is original. Jamili Dep., Vol. I at 24–25 & Vol. II at 71.

PBC does not deny that the content of Tapesh 2 has failed to comply with the contractual requirements; instead PBC counters that, at the time of contract formation, "EchoStar knew that Tapesh 2 broadcast English-language programs, knew that Tapesh 2 was mostly music video programming, and knew that some of the programming was not original." Def.'s Opp. at 7. This knowledge, PBC contends, "raise[s] material questions about the meaning of section 1.2." *Id.* at 7–8; *see E. Ridge of Fort Collins, LLC*, 109 P.3d at 974 (holding that extrinsic evidence can be conditionally admitted for the purpose of determining whether a contract is ambiguous).

PBC, however, has not presented any evidence to support its assertion regarding EchoStar's knowledge about Tapesh 2's programming content at the time of the Agreement's execution in September 2003. In fact, as discussed above, the evidence shows Tapesh 2 did not even exist at that time. Mr. Jamili testified that "[w]e started this channel [Tapesh 2] only for EchoStar," and in response to a question about when Tapesh 2 launched, Jamili replied, "I don't remember. February of 2004, maybe." Jamili Dep., Vol. I at 61, 100. This date is more than four months after the parties entered into the Agreement, and EchoStar could not have known at that time about the content of Programming that did not exist. Accordingly, PBC has failed to raise a genuine issue of material fact regarding its compliance with the Agreement's provision governing the Tapesh 2 programming requirements, and the evidence shows as a matter of law that PBC failed to comply with this provision.

### *4. Marketing Requirement*

Exhibit A of the Agreement provides that "[e]ach party shall spend $100,000 US Dollars per calendar year promoting the Programming Service on the DISH Network." Agreement, Ex. A, ¶ 12.  EchoStar contends that PBC failed to comply with this provision, as PBC admits that it "didn't pay" any money out-of-pocket to advertise the Programming.  Pl.'s Mot. at 19; Jamili Dep., Vol. I at 105.  PBC did, however, promote the availability of the Programming on the air on its own Tapesh 1 and Tapesh 2 channels, and on its own website.  *Id.* at 104–05.  EchoStar asserts that "[s]imply promoting the Programming on the air without expending money does not satisfy the requirement imposed by the Agreement."  Pl.'s Mot. at 19.

However, the obligation to "spend" $100,000 a year on marketing the Programming does not necessarily require payment to third parties.  The provision is ambiguous as to whether forgoing potential advertising revenue to market the Programming on its own network could satisfy the marketing requirement, and the interpretation of this provision is thus a question of fact.  In addition, there is a fact issue as to whether the value of the time spent promoting the Programming, which again could have been devoted to other paid advertising, amounted to $100,000 per year.  Thus, EchoStar has failed to show as a matter of law that PBC breached the marketing commitment contained in the Agreement.

### D.     Damages to the Plaintiff

EchoStar claims that, as a result of PBC's breaches of the Agreement, EchoStar has sustained monetary damages in the form of: (1) lost revenue; (2) increased

bandwidth costs and loss of bandwidth; (3) lost subscriber sales of programming and hardware; (4) lost customer service calls; (5) costs of excess inventory, storage, and lost activations; (6) interest that is continuing to accrue on the aforementioned amounts; and (7) costs, expenses, and legal fees.  Pl.'s Mot. at 20.  The basis of EchoStar's damage claim is that, because GlobeCast's Telstar 5 programming is free to air, while the Programming on EchoStar's DISH Network is subscription based, the Programming covered in the Agreement must be removed from GlobeCast's Telstar 5 for subscribers to have an incentive to migrate to DISH.  *Id.* at 11.

EchoStar contends that its damages for breach of the exclusivity provision may be calculated by multiplying the projected subscriber growth, 1,000 additional subscribers per month, by the monthly $14.99 retail price for a subscription to the Programming on its DISH Network.  Quattromani Aff., ¶ 7.  According to EchoStar, the calculation should take into account that under the Agreement EchoStar is entitled to 100% of the revenues from the first 1,800 subscribers and 75% of the revenues from subscribers exceeding 1,800.  Agreement, Ex. A, ¶ 9.  EchoStar further argues that the monthly calculation should continue from the date of PBC's breach of the exclusivity provision, September 30, 2004, to the date the Court enters an injunction.  *Proper v. Greager*, 827 P.2d 591, 597 (Colo. App. 1992) (court may award damages in addition to injunction to grant an injured party complete relief as long as plaintiff does not receive a double recovery).  Based on these calculations, EchoStar claims to have lost $2,305,462 in revenue alone as of May 31, 2006.  Quattromani Aff., ¶ 7.  PBC has not presented any evidence challenging EchoStar's claim of damages.

In light of the foregoing, EchoStar has stated a valid theory on which to recover damages for PBC's breach of contract, although the amount of such damages has yet to be determined.

### E.     Conclusion

The Court finds as a matter of law that PBC breached the exclusivity provision of the Affiliation Agreement as well as the provision governing the Tapesh 2 programming requirements. Accordingly, EchoStar is entitled to summary judgment on its claim that PBC breached those two provisions of the Agreement; however, summary judgment is denied with respect to EchoStar's claims that PBC breached the provisions relating to PBC's representations and warranties and PBC's marketing responsibilities. Further, the issues of the propriety of injunctive relief against PBC and the amount of EchoStar's damages remain pending.

## IV.    ANALYSIS OF DEFENDANTS' COUNTERCLAIM

EchoStar also seeks summary judgment against PBC's counterclaim, arguing that the evidence establishes as a matter of law that it is not liable to PBC for breach of contract. Pl.'s Mot. at 21–26. In a separate motion, EchoStar argues that there is no evidence to support PBC's counterclaim. *See generally* Pl.'s No Evid. Mot.

The party moving for summary judgment is not required to negate the elements of the nonmoving party's case. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Rather, entry of summary judgment against a party is appropriate if, after adequate time for discovery and upon motion, the party fails to make a showing sufficient to establish evidence of an element essential to that party's case and on which that party will bear

the burden of proof at trial.  *Celotex*, 477 U.S. at 322.  In such a situation there is a "complete failure of proof concerning an essential element of a nonmoving party's case," and there can thus be no genuine issue of material fact to defeat summary judgment.  *Id.* at 322–23.

PBC has not provided the court with any evidence to support its breach of contract counterclaim against EchoStar.  PBC's arguments in its response brief relate solely to EchoStar's breach of contract claim.  PBC never filed a response to EchoStar's "no evidence" motion and has effectively abandoned its counterclaim.  Thus, EchoStar is entitled to summary judgment on that claim.

## V.     CONCLUSION

For the foregoing reasons, it is hereby ordered that:

1. Plaintiff's Motion for Partial Summary Judgment on Its Claim for Breach of Contract and Against Defendants' Counterclaim (Dkt. # 46) is GRANTED IN PART and DENIED IN PART in accordance with this Order; and

2. Plaintiff's "No Evidence" Motion for Summary Judgment Against Defendants' Counterclaim (Dkt. # 47) is GRANTED, and defendants' counterclaim for breach of contract is DISMISSED WITH PREJUDICE.

DATED: July 3, 2007

BY THE COURT:

*s/ Phillip S. Figa*
_____
Phillip S. Figa
United States District Judge